UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK CHRISTOPHER DOWLING, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTIAN STARR, et al., <br><br> Defendants. | Case No. 3:19-cv-05777-WHO <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 43 |

Plaintiff Mark Dowling was arrested for violating a custody order concerning his two young daughters. He sued the two officers who made the arrest and the supervising officer who initially talked with him under 42 U.S.C. § 1983, alleging that the arrest violated the Fourth Amendment because the custody order did not prohibit him from taking the actions he took and so the officers lacked probable cause that he had committed a crime. I find that qualified immunity protects the officers: the undisputed facts show that the officers violated no clearly established law when they arrested Dowling and that they reasonably believed that a crime (willful violation of a court order) was taking place in their presence, which is generally sufficient to create probable cause. Defendants' motion for summary judgment is granted.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

I recount the facts in the light most favorable to Dowling. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). Because the pertinent interactions between the parties were largely captured on video, few *facts* about the arrest are in genuine dispute, though the parties draw different legal conclusions from them. I note when facts are disputed.

## A. Family Law Background

In September 2017, Dowling and Anne Findlay[1] were separated and in the process of divorcing. Deposition of Mark Dowling ("Dowling Depo.") [Dkt. No. 43-2 at 5–26] at 8, 13:12–17. They had two daughters, Claire (then age four) and Cora (then age three). Declaration of Mark Dowling ("Dowling Decl.") [Dkt. No. 44-1] ¶ 6. From the time of the separation approximately two years earlier, the Family Law branch of the Superior Court of California awarded the parents joint legal custody of both children. *Id.* Under California law, joint legal custody "means that both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." CAL. FAM. CODE § 3003. The Superior Court awarded physical custody to Findlay, with parenting time to Dowling on various days at various times. Dowling Decl. ¶ 6. Under California law, sole physical custody "means that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation." CAL. FAM. CODE § 3007.

Much of this case concerns a Temporary Emergency Order issued by the Superior Court on August 16, 2017 (the "Custody Order") [Dkt. No. 43-2 at 42–44]. According to Dowling, the Custody Order was obtained *ex parte* by Findlay because Claire was entering transitional kindergarten, so the parenting time arrangement was altered. Dowling Decl. ¶ 6. In any event, the Custody Order provides that Dowling "shall have care, custody and control" of Cora from 1:15 pm to 6:00 pm on Tuesdays and Thursdays, "care, custody and control" of Claire from 1:30 pm to 6:00 pm on Tuesdays and Thursdays, and "care, custody and control" of both children on alternate Saturdays from 10:00 am to 6:00 pm. Custody Order at 44. In addition to the substantive written order, the judge checked a form box labelled "Child Custody" and one labelled "Visitation (Parenting Time)." *Id.* at 42. The latter box has a pre-typed line that reads "The temporary orders for physical custody, care, and control of the minor children [specified previously] are subject to the other party's or parties' rights of visitation (parenting time) as follows." *Id.* But the area

---

[1] Findlay, at the time of the events, apparently still went by Anne Dowling. Both parties refer to her that way. Both for clarity in differentiating her from the plaintiff and because she now uses a different name, I refer to her as Findlay.

2

beneath is blank and directs the reader to the substantive written order already described. *Id.*

### B. Events Prior to Interacting with Police

This events at issue occurred on Friday, September 15, 2017, in Livermore, California. On that day, Cora was at Livermore Playschool and Claire was at Arroyo Seco Elementary School. The schools are a mile or less apart. Dowling Depo. at 13, 62:1–10. In her deposition, Findlay stated that she gave the director of Livermore and the front desk at Arroyo Seco copies of the Custody Order. Deposition of Anne Findlay ("Findlay Depo.") [Dkt. No. 43-2 at 28–40] at 33–34, 21:3–22:15.

Previously, on September 13, 2017, Dowling sent several text messages to Findlay that said, "I intend to make up missed FPT [father parenting time] On friday 091517," and "[t]his will not affect your schedule, assuming you are working." Dkt. No. 43-2 at 46. On September 14, she wrote back, "I replied to your texts by email last night." *Id.* The email, sent the night of September 13, blind copied Findlay's divorce lawyer. *Id.* at 48. It first quoted Dowling's text message and then said, "I do not agree to any changes to the custody order for Friday 9/15/17 and would like to remind you that both schools (Arroyo Seco and LPS) and ESS have copies of our current custody order, and are aware of our custody schedule." *Id.*

On September 15, Dowling went to Livermore Playschool and picked Cora up around lunchtime. *See* Dowling Depo. at 13, 62:11–22. At some point, Dowling began recording the events on a GoPro camera; according to him, it was because he encountered "friction" from the Livermore Playschool director, Gina Elliot, to taking Cora. *Id.* at 64:1–24. That director called Findlay when Dowling arrived and, according to Findlay, said he was acting "belligerent," that she was worried for the safety of those there, and that Dowling was "insisting he could take Cora." Findlay Depo. at 37, 34:2–12. Findlay called her attorney who recommended calling the police. *Id.* Findlay "immediately" did so. *Id.* Findlay says that she told the director "on at least two, two forceful occasions in that phone call, [Dowling] does not have my permission to take [Cora] today." *Id.* at 36:19–22. Despite this, Findlay says that she was concerned about the young children there witnessing the conflict so she told the director "do what you need to do. He doesn't have my permission to take her." *Id.* at 37:3–7. The director remembers it differently. According

3

to the director as captured on an officer's body camera, Findlay told her that she could release Cora to Dowling to avoid trouble. *See* COL – Dowling – 00102 – 166pc_7of7.mp4.

Dowling then drove with Cora to Arroyo Seco, still recording their interaction. According to him, he had previously been told that parents could come to the school to have birthday lunches with their children. Dowling Decl. ¶ 10. Claire's fifth birthday was coming up and Dowling says he came with Cora to Arroyo Seco to have lunch with both girls to celebrate. *See id.*

When he got to Arroyo Seco—still recording on his GoPro—staff, led by acting principal Ravi Prabhala, would at first not let him see Claire. Dowling Depo. at 14, 69:1–8. There was a discussion; because the question here is the officers' liability for the arrest, the precise details of that conversation are not relevant. The end of this interaction was the acting principal agreeing that Dowling and Cora could have lunch with Claire in the principal's office, which they did. *Id.* at 15, 72:17–25.

**C. First Police Contact**

At least one police officer went to Livermore Playschool, as described above, in response to Findlay's call. Defendant police officers Christian Starr and Anthony Batrez arrived at Arroyo Seco at approximately 12:10 pm.[2] *See, e.g.*, Declaration of Christian Starr ("Starr Decl.") ¶¶ 7–8.[3] Their interactions with Dowling are captured on video from their body cameras and, sometimes, Dowling's GoPro. Starr and Batrez spoke with school staff in the front office and, soon after arriving and before making contact with Dowling, asked if the school had a copy of the Custody Order. *See, e.g.*, *id.* ¶ 8; COL – Dowling 000097 – Confidential 166pc_2of7 at 0:50–1:52. Starr reviewed the Custody Order and the defendants verified that it was signed. COL – Dowling

---

[2] Starr first went to Findlay's house but she was not there. Starr Decl. ¶ 6.

[3] Starr and Batrez's declarations do not state they are sworn (despite appearing to comply with spirit of the rule because they state they would testify to the facts within). In one sentence buried in his brief, Dowling argues that they are inadmissible. Dkt. No. 45 at 7. His specific objection, however, is to testimony about when the officers subjectively believed they had probable cause to make an arrest. *Id.* That is not the inquiry under the Fourth Amendment or for qualified immunity; I do not rely on that testimony anyway. *Alford v. Haner*, 333 F.3d 972, 977 (9th Cir. 2003), *rev'd and remanded on other grounds sub nom. Devenpeck v. Alford*, 543 U.S. 146 (2004). I cite both declarations, despite not being technically sworn, only for events that appear in the video, so there is no prejudice to Dowling and the evidence is reducible to an admissible form.

4

000097 – Confidential 166pc_2of7 at 0:50–1:52. They then entered the principal's office to find Dowling, Cora, and Claire eating there. *See, e.g.*, Starr Decl. ¶ 11.

Starr, Batrez, and Dowling got into a discussion about whether his actions violated the Custody Order. After determining that Dowling had removed Cora from school, Starr asked whether he had a court order that differed from the Custody Order. COL – Dowling 000097 – Confidential 166pc_2of7 at 3:10–3:20. He explained that he read the Custody Order to allow time with the children "on Tuesdays and Thursdays." *Id.* at 3:15–3:30. Dowling responded that he had previously discussed this with Findlay—*i.e.*, the text message and email. *Id.* at 3:30–4:05. He said that Findlay "did not object." *Id.* Starr asked whether she "agreed," or "respond[ed]" at all, and Dowling replied that Findlay was mentally ill and he did not always understand what she said. *Id.* at 4:00–4:10. He reiterated that he was "making up father parenting time" that had previously been taken up by a family court hearing. *Id.* at 4:25–4:45.

Throughout the interaction, Starr repeatedly asked whether there were other court orders that would apply, or whether the Custody Order (of which he had a copy) was the only one. *See, e.g.*, *id.* 3:10–3:20, 5:05–5:14. Dowling never responded that there was another order, he usually responded that he was making up his parenting time—and sometimes with other responses, like that he had not been given an adequate opportunity to be heard by the judge. *Id.* at 5:12–5:25. Finally, after several minutes of this, Dowling stated he was "done talking." Starr replied that he was not "trying to be rude" but that if Dowling was "done talking" then all the officers "had to go off of" was the Custody Order, which they said Dowling was violating. *Id.* at 5:25–5:55. Starr eventually stepped out to call Findlay, who requested that Dowling be arrested for violating the Custody Order. *See* Starr Decl. ¶ 14. Starr and Batrez told Dowling that he and the children could finish their lunch.

Eventually, defendant Sergeant Marc Plute arrived and decided that Dowling should not be arrested so that he could leave campus without further incident. *See id.* ¶ 17; Declaration of Marc Plute ("Plute Decl.") [Dkt. No. 43-4] ¶ 8. The defendants claim that they told Dowling that he had to leave the campus and was in violation of the order. Starr Decl. ¶ 18; Plute Decl. ¶ 9. But this does not appear on any of the footage provided, and Dowling disputes that it occurred. Dowling

5

Decl. ¶ 12. For purposes of summary judgment, I assume that it did not occur. At some point, Findlay decided that a friend of hers would pick up Cora (and later Claire), and Dowling acquiesced to this. Dowling Decl. ¶¶ 13–14. Findlay's friend arrived and took Cora. *Id.* Dowling stayed behind, apparently to clean up the office. Dowling left the building but, according to him, did not leave the vicinity. Dowling Depo. at 18, 83:10–17. The officers left.

### D. Second Interaction with Police

At some point, Dowling came to stand outside of Claire's classroom. He says (and told teachers and the defendants when asked) that it was to reassure Claire after the frightening experience of having police officers intrude on the lunch and question him. *See id.* at 83:10–84:6. At approximately 1:30 pm, Arroyo Seco staff called 911 to say that Dowling was outside of Claire's classroom. Starr Decl. ¶ 20. Starr and Batrez (not Plute) returned to Arroyo Seco. After some discussion—this time, more heated than in the principal's office—Starr ordered Dowling to leave campus. *See id.* ¶ 22. Dowling repeatedly told the defendants he would comply with their orders. *See* COL – Dowling – 000099 – 166pc_4of7.mp4 at 19:58. Starr's body camera shows the acting principal telling him that he asked Dowling to leave multiple times. The acting principal said that he wanted Dowling to leave campus and that, if he refused, he wanted him to be arrested. COL – Dowling – 000099 – 166pc_5of7.mp4. Dowling maintains the principal never told him this; again, for purposes of this motion I accept Dowling's account. Dowling Decl. ¶ 20–21. Eventually, at the officers' direction, Dowling walked away from Arroyo Seco.

### E. Third Interaction with Police and Arrest

The parties dispute whether Dowling set off in the direction of Livermore Playschool, but they agree that he ended up in its vicinity. *See, e.g.*, Dowling Decl. ¶ 23. The defendants followed Dowling in their car for part of his walk. COL – Dowling 000100 – 166pc_5of7 at 3:26. Dowling says he was thirty to forty yards away from the Playschool; Starr says that Livermore staff reported that he was walking up to the campus access gate. Starr Decl. ¶ 23. In any event, Starr and Batrez once again confronted Dowling. Dowling protested that he had complied with their orders by leaving Arroyo Seco. COL – Dowling 000101 – 166pc_6of7 at 0:25–0:38. He says—and told them at the time—that he had ordered a Lyft to drive away. Dowling Decl. ¶ 23.

Dowling's car was parked in the Arroyo Seco parking lot from when he drove Cora there, which the defendants knew and discussed on tape. Indeed, that was one reason they believed he was not actually leaving. Starr and Batrez quickly placed Dowling under arrest. COL – Dowling 000101 – 166pc_6of7 at 0:40. The post-arrest probable cause statement records the arrest as being for violation and attempted violation of a court order. *See* Dkt. No. 43-3 at 30–31.[4]

## II. PROCEDURAL HISTORY

Dowling, represented by counsel, filed suit against Starr, Batrez, and Plute on September 13, 2019. Complaint ("Compl.") [Dkt. No. 1]. Discovery ensued. Now, the defendants move for summary judgment on the single claim against them. Motion for Summary Judgment ("Mot.") [Dkt. No. 43].

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

---

[4] Several events or details referenced by the parties are not recited here because they are not relevant. The defendants, for example, state that Dowling had almost $10,000 cash on him when he was arrested and Dowling discusses his own interactions with the principal before the police arrived. I focus on the facts known to the officers at the time. *See Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

7

facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

The only question here is whether the defendants can be held liable under 42 U.S.C. § 1983[5] for arresting Dowling. It is worth emphasizing that no other issues—including whether Dowling's actions were legal, whether third parties' actions were proper, or the child custody dispute—are before me.

Dowling's complaint alleges a single cause of action: that the defendants violated his rights under the Fourth Amendment. Compl. ¶¶ 10–20. Although the basis of this claim was arguably unclear from the Complaint itself, Dowling's brief shows that he solely challenges whether there was probable cause to arrest him, not the defendants' other actions (such as ordering him to leave campus, the search attendant to arrest, or the level of force used). *See, e.g.*, Opposition to the Mot. ("Oppo.") [Dkt. No. 44] 7–8. The defendants argue that there was probable cause to believe Dowling (1) violated the Custody Order, (2) attempted to violate the Custody Order, and (3) trespassed on school grounds. *See* Mot. 11. They also argue that they are entitled to qualified immunity. *Id.* 17. For the reasons that follow, I agree with the latter argument.

Qualified immunity shields governmental officials from Section 1983 liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Qualified

---

[5] 42 U.S.C. § 1983 creates a civil cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

8

immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

**I.     ORDER OF DECISION**

The Supreme Court has held that, in appropriate circumstances, courts may "begin[] and end[]" with an analysis of the clearly-established prong of the qualified immunity test. *Pearson*, 555 U.S. at 236. That is, if the officers are entitled to qualified immunity under that prong, courts need not always address whether there was a violation of a constitutional right. *See id.* One paradigmatic case for which this is appropriate is when the decision "rest[s] on an uncertain interpretation of state law" or "requires clarification of an ambiguous state statute." *Id.* at 238.

The defendants' primary argument is that they had probable cause to believe that Dowling had violated or attempted to violate the Custody Order.[6] When determining probable cause, the Ninth Circuit has drawn a distinction between reasonable mistakes of fact in enforcing a court order and mistakes interpreting that court order. The court has held that the latter *can* deprive an officer of probable cause. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1070 (9th Cir. 2004). And despite the parties' certainty about their interpretations, it is not immediately obvious whether and how the Custody Order applied to this situation. The Custody Order itself only states the days and times that Dowling and Findlay each had custody of Cora and Claire. It was not a protective order that affirmatively prohibited contact. There is little memorialized precedent in California that lays out what specific acts are custodial and not.

It is not possible to determine whether there was probable cause here without interpreting the Custody Order and, consequently, California family law. Injecting a federal court into the heart of California's family law scheme in these circumstances would be unwise and unnecessary, particularly because Findlay is not represented in this suit and interpreting the Custody Order

---

[6] The defendants' other justification is that they had probable cause to arrest Dowling for trespass. Because I determine the defendants are entitled to qualified immunity, I do not address the trespass issue. I note, however, that the probable cause statement—contemporaneous documentary evidence—does not indicate that the arrest was made for that reason; it focuses on the court orders. It might be, therefore, that the trespass argument is a post-hoc justification.

9

would affect her parental and custodial rights. Accordingly, because the clearly-established prong settles the issue of immunity, it is appropriate to address it without deciding the violation prong.

## II.     ENTITLEMENT TO QUALIFIED IMMUNITY

The Supreme Court has explained that qualified immunity is motivated by the concern that the officer "had fair notice that her conduct was unlawful." *Brosseau*, 543 U.S. at 198. Consequently, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citations omitted). Reasonableness "is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). As a result, "[a]lthough [the] caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). Framed differently, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (internal quotation marks omitted). It applies here because the defendants did not violate clearly established law.

The requisite notice to the officer must come either from (1) "a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment," *White*, 137 S. Ct. at 552, or (2) from when "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There is no case that Dowling points to (or that I have found) that addresses a fact pattern like this, or a similar one, and found that officers violated the Constitution. Nor does Dowling identify any broader legal principle that would apply with "obvious clarity" to render the defendants' actions unlawful.

The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and

10

particularly describing the place to be searched, and the persons or things to be seized." The Amendment requires that when, as here, police officers make a warrantless arrest (constitutionally a "seizure"), they have probable cause to do so. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Probable cause is more than mere suspicion." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). It requires that, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that a crime was committed." *Id.* (internal quotation marks and citation omitted). If the officer possesses probable cause of even a "very minor criminal offense *in his presence*," the arrest may be warrantless. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (emphasis added).

Dowling points to the most general principles of Fourth Amendment law (such as warrantless arrests requiring probable cause) in his argument. Oppo. 5–6. Those broad principles are of no help to him in this particular qualified immunity analysis because "specificity is especially important in the Fourth Amendment context," and probable cause is a highly fact-specific inquiry. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). The bare requirement that officers need probable cause tells us nothing about whether Starr and Batrez's arrest violated clearly established law. And there is no decision that Dowling identifies that clearly establishes that what Dowling did is not a violation of California's custodial laws.[7]

The Ninth Circuit has laid out requirements necessary for officers to arrest someone based on a potential violation of court orders related to the type here (protection orders and warrants).[8] The core of the Ninth Circuit's holding in this area is that, when officers make an arrest based on an alleged violation of a court order, they have the obligation to familiarize themselves with the precise terms of the order before doing so. In *Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2004), for example, a protection order barred the plaintiff from various forms of contact and

---

[7] Setting aside general statements of law, Dowling's substantive legal argument applying the law to the facts here is less than two pages and cites only one case about the Fourth Amendment with no elaboration. Oppo. 7–8.

[8] Cases that deal with child custody and qualified immunity appear to virtually always be about state officials removing children from their parents' custody (usually based on constitutional due process violations). *See, e.g.*, *Campbell v. Burt*, 141 F.3d 927 (9th Cir. 1998).

11

behavior related to his wife and her children. *Id.* at 1067. But police officers enforcing it never "ascertained" the "contents" of that order; they instead relied on the way the wife classified the order to them and arrested the plaintiff for violating what she said it prohibited. *Id.* at 1061–63, 1065. The Ninth Circuit held that the actual protection order had not prohibited what the plaintiff had done (coming within 300 feet of them at a church), so an arrest for violating the order was without probable cause. *Id.* at 1067–68. It then went on to find that the officers were not entitled to qualified immunity because the caselaw clearly established officers' duty to ascertain the terms of court orders. *Id.* at 1068–71. The court has reiterated that holding. *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006). And it has held roughly the same thing about search warrants. *Marks v. Clarke*, 102 F.3d 1012 (9th Cir. 1996), *as amended on denial of reh'g* (Feb. 26, 1997); *Guerra v. Sutton*, 783 F.2d 1371 (9th Cir. 1986).

Here, as noted, virtually the first thing that the officers did was to request, receive, and read a copy of the Custody Order. They told Dowling that they believed him to be in violation of that order because it provided that the day he was there was Findlay's custody day. They then asked Dowling many times whether he had any countervailing order that would allow him to do what he had done. His response was never that there was another court order that permitted him to do so, or that their understanding of custody was wrong. Instead, he insisted over and over that he was "making up for" past lost parenting time. But the Custody Order that the officers had did not make provision for making up time in this way.[9] In these specific circumstances, the line of Ninth Circuit cases cited above does not clearly establish that anything more was required for probable cause to exist. To the contrary, the defendants here familiarized themselves with the order's terms and gave Dowling many opportunities to show there was a countervailing order.

While the officers' interpretation of the Custody Order was eminently reasonable, suppose that Dowling's actions did *not* violate the Custody Order and that the defendants misinterpreted it. Even if the defendants erred, "the protection of qualified immunity applies regardless of whether

---

[9] Even if the Custody Order impliedly permitted (or California family law explicitly permitted) the terms of the order to be changed by agreement of both parents, the officers had enough evidence in front of them for a reasonably prudent officer to conclude there was no such agreement at least for probable cause purposes: Findlay was the one who called the police.

12

the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231. The undisputed facts demonstrate that any mistake in interpreting that order was a reasonable misapprehension of the law and facts. The defendants reviewed the Custody Order, which provided that Dowling did not have custody of Cora and Claire during that time. They understood "custody" to mean that he could not be with them then absent authorization. They made a series of attempts to further clarify the situation, including asking Dowling many times whether he had other court orders that would contravene the Custody Order. Accordingly, they reasonably believed that they had probable cause that a misdemeanor—willful violation of a court order, *see* CAL. PEN. CODE § 166(a)(4)—was being committed in their presence. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (internal quotation marks omitted)); *Atwater*, 532 U.S. at 354 (holding that offenses committed in an officer's presence constitute probable cause).

Dowling's brief essentially makes no argument in response on qualified immunity. In the introduction to his argument, he lays out some general legal principles related to it and that's about it. The brief explains in a bit more detail why he asserts that probable cause was lacking, yet he never again mentions qualified immunity, including to explain how he views the doctrine as applying here. Under usual principles, Dowling abandoned that argument, and gave the defendants no fair target to aim their reply brief at. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009); *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 919 (N.D. Cal. 2016). But assuming he did not abandon it, his relatively cursory argument for why probable cause was lacking does not change the preceding qualified immunity analysis.

Dowling focuses first on the allegedly disputed fact of how belligerent he was being. *See* Oppo. 7. My finding does not depend on that at all. He next speculates—though does not explain how it fits into the analysis—that he was not arrested at first because the defendants knew no prosecution would occur. *Id.* Whether charges will ultimately be filed or whether guilt can be shown beyond a reasonable doubt do not influence whether probable cause existed or whether qualified immunity attaches based on it. *Lopez*, 482 F.3d at 1072. Dowling also says that there

13

are "numerous disputed facts" about the second interaction (which was captured on video), but the example he gives is whether he was permitted to clean up after the lunch in the principal's office. Oppo. 8. Even if that fact were genuinely disputed, it is not material to the analysis above. And Dowling's Declaration (not his brief) argues that it was unknown whether Cora returned to Livermore Playschool, so his being near there does not evidence intent to see her. Dowling Decl. ¶¶ 24–25. If my findings here were solely predicated on an that single alleged attempted violation of the order based on Dowling being near that school again, this argument might matter, but neither the lawfulness of the arrest here nor whether qualified immunity attached turn on it.[10]

Finally, Dowling discusses alleged fabricated evidence and false statements. His brief includes the following sentence near the end: The defendants' probable cause statement "if [sic] rife with false disputed facts as outlined in Plaintiff Declaration." Oppo. 8. There is no elaboration at all on this point in the brief, including its cursory factual background section.[11] At the hearing on this motion, I described my tentative holding—which tracks the analysis above—and asked, in addition to general argument, what *material* and *genuinely* disputed facts Dowling's counsel could point me to that would prevent summary judgment on his claim. Counsel said that the defendants' "fabrication of evidence" meant summary judgment must be denied.

To be sure, if a police officer deliberately fabricates evidence to make an arrest, that arrest is by its nature made without probable cause.[12] That is not (even on Dowling's telling) the situation here. All of the material facts that I recite above—such as taking Cora out of school,

---

[10] His other argument in the brief goes to the defendants' trespass justification, *see* Oppo. 8, which I do not address.

[11] It is also insufficient for Dowling simply to direct the court to his separate declaration if he means to do so to provide substantive legal argument. The place for legal arguments is briefs, not sworn declarations from parties. The declaration is also twenty-one pages; if treated as a legal brief and combined with Dowling's actual brief, it would put him over the permitted page limits. Nonetheless, I have reviewed the Declaration (indeed, I include far more specific citations of it in this Order than Dowling does in his brief) and explain in the body of the Order why the assertions in it that Dowling can be considered to have fairly raised in opposition to the motion do not change the outcome.

[12] An actual fabrication of evidence claim has its own doctrinal elements that Dowling does not reference or purport to show genuine disputes about. *See, e.g.*, *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

14

having lunch with both daughters on a non-custody day, what the Custody Order said, that the officers familiarized themselves with it—were captured on video, admitted by Dowling, or both; they were not fabricated. Dowling has not shown any evidence that the facts were fabricated that go to that issue, or to qualified immunity.

It is difficult to know what alleged fabricated evidence Dowling is referring to; I will not canvas the entire record to piece together a theory for him. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.") (internal quotation marks and alteration omitted). The probable cause statement is the only such evidence referenced, albeit glancingly, in Dowling's brief. Dowling does not analyze it there and did not do so with specificity at the hearing. It describes the factual background and states that Dowling was arrested for violations of the Custody Order (and officers' belief that he would continue doing so due to walking to Cora's school). *See* Dkt. No. 43-3 at 30–31. In light of this, and Dowling's lack of developed argument, there is no disputed fact here that would preclude summary judgment. Of course, I do not hold or imply that, so long as the arrest was supported by probable cause, officers can then go fabricate other evidence, or that any such evidence would be legally irrelevant. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 275 (2d Cir. 2016). What I find here is that Dowling has not pointed with particularity to any fabricated evidence that alters the relevant analysis.

In sum, the material facts not subject to genuine disputes indicate that reasonable officers in the defendants' position would reasonably believe they were complying with the Fourth Amendment because they had witnessed a willful violation of a court order, a misdemeanor. Whether they were right or wrong, there was no law clearly establishing that their actions violated the Fourth Amendment. They are therefore entitled to qualified immunity.[13]

---

[13] Plute is separately not liable because Dowling has not shown he had any involvement in the arrest—he inarguably did not make it, and there is no record evidence he took some other related

15

**CONCLUSION**

The defendants' motion for summary judgment is GRANTED. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: July 8, 2021



William H. Orrick
United States District Judge

---

action, like ordering it. His only involvement was in the initial interaction, which Dowling does not argue was unconstitutional. Accordingly, even if summary judgment were denied for Starr and Batrez, it would be GRANTED for Plute on this independent basis. Dowling has no counterargument to this in his brief.

16